UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

UNITED STATES OF AMERICA,

      Plaintiff,

   v.

RUTH PATRAS,

      Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 08-2079
(JEI/KMW)

**OPINION**

---

**APPEARANCES:**

U.S. DEPARTMENT OF JUSTICE
Jan M. Geht
E. Christopher Lambert
Geoffrey J. Klimas
P.O. Box 227
Ben Franklin Station
Washington, DC 20044
    Counsel for Plaintiff

TANENBAUM LAW, LLC
Steven M. Tanenbaum
450 Main Street
Third Floor
Metuchen, NJ 08840
    Counsel for Defendant

**IRENAS**, Senior District Judge:

This is a civil federal tax liability suit brought by the United States against Defendant Ruth Patras pursuant to the Uniform Fraudulent Transfer Act ("UFTA"), N.J.S.A. §§ 25:2-20 to -34.  The United States argues that Defendant Patras's husband,

1

Dr. Anthony Patras, sought to evade his federal income tax liabilities by fraudulently transferring 6 Princess Court, Holmdel, NJ ("the Property") to Defendant Patras.

This Court held a bench trial on September 4-6 and September 21, 2012.  The Court now issues this Opinion in accordance with Federal Rule of Civil Procedure 52(a)(1).[1] Section I contains findings of fact.  Section II contains conclusions of law.  For the reasons stated herein, the Court concludes that Defendant Patras acquired the Property through a fraudulent transfer, that her husband, Dr. Patras, is the true owner, and that he owns the Property subject to federal tax liens.  The Court also concludes that Defendant has transferee liability and that the United States is entitled to a personal judgment against her.  Accordingly, the Court will enter judgment in the United States' favor.

## I.

1.  Dr. Anthony Patras ("Dr. Patras") bought 6 Princess Court, Holmdel, New Jersey ("the Property") on February 27, 1989 for $1,660,000 from Walter and Jerry Karach.  (Stip. Facts ¶ 39)[2]

---

[1] "In an action tried on the facts without a jury . . . the court must find the facts specifically and state its conclusions of law separately.  The findings may . . . appear in an opinion or memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

[2] This citation refers to the stipulated facts of the Joint Final Pretrial Order of December 15, 2010.  (Dkt. No. 38, at 2-3)

The Property was custom built for Dr. Patras by Walter, Jerry, and John Karach.  (Trial Tr. 6:19-24, Sept. 5, 2012)  It encompasses 2.77 acres of land and a 7,183 square foot residence.  (P.'s Ex. 183, i)

2.  Dr. Patras has lived in the Property since 1989 without any interruptions. (Stip. Facts ¶ 2)

3.  Anthony and Ruth Patras were married in August 1990. They have lived in the Property together since then.  (Trial Tr. 4:18-20, 115:20-116:14, Sept. 5, 2012)

4.  On July 12, 1993, Anthony Patras filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court of the District of New Jersey.  (P.'s Ex. 138)  He remained in bankruptcy until February 25, 1999.  (*Id.* Tab A)

5.  When he filed for bankruptcy, Dr. Patras had $4,968,945.93 in liabilities, $140,399.31 of which were federal income tax liabilities owed to the Internal Revenue Service ("IRS") for the years 1991 and 1992.  (P.'s Ex. 138 Tab C; Trial Tr. 8:20-9:1, Sept. 5, 2012)

6.  On October 28, 1994, Dr. Patras was ordered to transfer title of the Property to John and Olga Karach for $800,000 as part of his bankruptcy proceedings.  (Stip. Facts ¶ 1)  He did so on November 30, 1994.  (P.'s Ex. 109A)

7.  Although the deed conveying the Property to John Karach was from both Anthony and Ruth Patras (*id.*), Ruth Patras was

3

never placed on the deed between when Dr. Patras bought the Property in 1989 and when he sold it in 1994.

8.   John Karach was the father of Walter and Jerry Karach and a close personal friend of the Patrases. (Trial Tr. 6:25-7:1, Sept. 5, 2012)  During the time he owned the Property, he allowed the Patrases to live there.  (*Id.* at 14:19-15:3) Although they paid rent to John Karach, there was no lease. (*Id.* at 15:2-8)

9.   In 1996, John Karach told Dr. Patras that he wanted to sell the Property. (*Id.* at 15:9-21)  At the time, Dr. Patras was still in bankruptcy and could not buy the Property, although he testified that he tried to do so. (*Id.* at 7:9-8:3, 15:22-16:5, 123:14-20; P.'s Ex. 138 Tab A)

10.  Dr. Patras approached his friend, Donato Gallo, Jr. ("Gallo") and suggested that he buy the Property so that the Patrases could continue to live there.  (Trial Tr. 16:21-17:5, Sept. 5, 2012; Cicerale Dep. Tr. 15:21-16:9; Gallo Dep. Tr. 24:24-25:5)

11.  Dr. Patras and Gallo were best friends and "like brothers."  They were each other's best men and went on trips together.  (Trial Tr. 16:9-17, 124:7-12, Sept. 5, 2012; Gallo Dep. Tr. 78:13-80:7, 81:14-17, 82:2-19)

12.  Dr. Patras, Gallo, and Frank Cicerale ("Cicerale"), Gallo's accountant, knew that Gallo had to take title to the

4

Property because Dr. Patras could not purchase it himself due to his financial difficulties. (Gallo Dep. Tr. 34:3-11, 35:18-36:2; Cicerale Dep. Tr. 15:24-16:9, 22:8-17, 60:18-24, 69:16-18, 76:20-25)

13.  Dr. Patras told Gallo that he would not lose money on the house, and they agreed that Gallo would not incur any expenses while he owned the home. (Trial Tr. 17:15-17, 38:23-41:4, 106:6-10, Sept. 5, 2012; Cicerale Dep. Tr. 24:25-25:25, 27:6-20, 39:1-22, 43:8-16, 48:7-11, 74:6-16; Gallo Dep. Tr. 30:7-14, 31:20-32:11, 99:2-18)

14.  Dr. Patras and Gallo further agreed that Patras would buy the Property back from Gallo within a year, which was the amount of time Patras said he needed to settle his legal and financial problems. (Gallo Dep. Tr. 30:18-31:19; Cicerale Dep. Tr. 60:16-61:1; P.'s Ex. 136 Tabs H, K & N)  At least one document refers to them making this agreement in 1996 (P.'s Ex. 136 Tab N), and another references Gallo extending the option to purchase for "another year." (*Id.* Tab K)

15.  On June 6, 1996, Gallo bought the Property from John and Olga Karach for $843,000. (P.'s Ex. 110; Trial Tr. 15:18-21, 16:6-8, 18:24-19:2, Sept. 5, 2012; Gallo Dep. Tr. 23:23-24:16)  He was the only person on the deed from 1996 until 2001. (P.'s Exs. 110, 112, 114)

16. Dr. Patras was actively involved in the sale of the Property from John Karach to Gallo. He suggested that Gallo take out loans to buy the Property, procured funds for Gallo's down payment, and called the attorney who was handling the closing on several occasions. (Trial Tr. 19:12-23:17, 23:24-25:25, 26:22-29:14, 30:14-31:9, Sept. 5, 2012; P.'s Ex. 135, Tabs A & B)

17. Barry Szymanski, who owned GP Mortgage & Finance, was the mortgage broker involved in the transfer from the Karaches to Gallo. (P.'s Ex. 135 Tab C; Trial Tr. 26:19-21, Sept. 5, 2012)

18. To finance his purchase of the Property, Gallo took out a mortgage of $632,000 from Washington Mutual Home Loans, Inc. ("Washington Mutual"). (P.'s Ex. 135 Tab C, 10; P.'s Ex. 136 Tabs D & E; P's Ex. 137 Tab A; Gallo Dep. Tr. 95:17-20)

19. Gallo also provided $228,000 as a down payment to purchase the Property. (Trial Tr. 21:18-22:21, Sept. 5, 2012; Gallo Dep. Tr. 54:8-55:6; Stip. Facts ¶40) Of this payment, Gallo borrowed $33,000 from Cadogan Management ("Cadogan") and $120,000 from New Brunswick Health Treatment Center ("New Brunswick Health"). (P.'s Ex. 137 Tab A; Stip. Facts ¶ 40; Trial Tr. 21:18-23:6, 26:22-27:4, 29:12-14, Sept. 5, 2012) $75,000 of the payment came from Gallo's personal funds. (Trial Tr. 22:5-

6, Sept. 5, 2012; Cicerale Dep. Tr. 27:21-28:4; P.'s Ex. 137 Tab A)

20.  Both New Brunswick Health and Cadogan were companies over which Dr. Patras had significant, if not total, control. He was the president and owner of New Brunswick Health, controlled its finances, and signed federal tax returns on its behalf.  (Trial Tr. 27:5-7, 41:5-15, 74:11-76:16, Sept. 5, 2012; P.'s Exs. 117-20; P.'s Ex. 136 Tabs H & I)  In addition, Dr. Patras was the vice president of Cadogan and signed federal tax returns on its behalf.  At times he earned more from Cadogan than its owner did.  (Trial Tr. 30:19-31:15, 43:17-24, Sept. 5, 2012; P.'s Exs. 127-33)  Further, Ruth Patras co-signed loans for Cadogan.  (Trial Tr. 31:13-32:15, 170:13-172:10, Sept. 5, 2012; P.'s Ex. 137 Tab P, 8)

21.  Both New Brunswick Health and Cadogan were companies involved with medical services and billing, and neither company made residential loans regularly.  (Trial Tr. 27:5-16, 29:15-21, 30:14-18, Sept. 5, 2012)

22.  Both loans were made to benefit Dr. Patras personally, and, in Cadogan's case, the loan was made at Dr. Patras's behest.  (*Id.* at 20:1-23:18)

23.  Neither New Brunswick Health nor Cadogan reported the loans to Gallo on their federal tax returns from 1996 to 2001,

nor did they report any interest income during that time. (P.'s Exs. 117-20, 127-33)

24. Although Gallo promised to repay the loan to New Brunswick Health within one year with seven percent interest, he did not repay the loan until 2001 when he sold the house to Ruth Patras. (P.'s Ex. 136 Tabs H & I; Cicerale Dep. Tr. 50:22-51:3) However, he did make interest payments for the duration of the loan. (P.'s Ex. 136 Tab D)

25. From 1996 to 2001, the Patrases lived in the Property; at no time did Gallo ever live there. (P.'s Ex. 136 Tab E, 18) During this period, Dr. Patras made rental payments of approximately $9,000 per month to Gallo, which were sufficient to cover the mortgage, insurance, utilities, maintenance, and taxes for the Property. (Stip. Facts ¶2; Trial Tr. 33:9-12, Sept. 5, 2012; P.'s Ex. 136 Tab A; Gallo Dep. Tr. 31:20-32:8) Cicerale described these payments as "a smoke screen to cover for all the expenses." (Cicerale Dep. Tr. 39:20-23) Further, during this period, Dr. Patras possessed, controlled, and enjoyed the benefits of the Property. (Cicerale Dep. Tr. 74:25-75:7; Stip. Facts ¶ 2)

26. Since Ruth Patras had little to no income during this time period, Dr. Patras provided all of the money for the rental payments. (Stip. Facts ¶¶ 17-26; Trial Tr. 46:14-17, Sept. 5, 2012)

27.   Gallo would not have been able to purchase or maintain the Property without Dr. Patras's payments.  (P.'s Ex. 136 Tab Q; Gallo Dep. Tr. 43:5-7; Cicerale Dep. Tr. 70:11-12, 71:21-25) Indeed, in 2001, his adjusted gross income—without any income from the Property—was $23,000.  (P.'s Ex. 136 Tab Q)

28.   On several occasions, Dr. Patras was late in making rental payments to Gallo (P.'s Ex. 136 Tab Q, 4), yet Gallo took no action against Patras and made no effort to evict him. (Trial Tr. 48:5-49:2, Sept. 5, 2012)

29.   From 1993 until 2003, Dr. Patras continued to underpay his income taxes, which contributed to him being unable to buy the house back from Gallo within the agreed upon one-year time frame.  (*Id.* at 58:7-14, 64:1-19; P.'s Exs. 101-06)

30.   In 2000, Gallo told Dr. Patras that he did not want to hold the Property any longer, as he wanted to move to California for personal reasons.  (Gallo Dep. Tr. 62:18-24)  At that time, he agreed to hold the Property for another year.  (P.'s Ex. 136 Tab K)

31.   On April 16, 2001, Gallo executed a deed that transferred ownership of the Property to Gallo and Ruth Patras as tenants in common for a sum of less than $100.  (P.'s Ex. 112)  On June 6, 2001, Gallo and Ruth Patras transferred the Property again, this time to Ruth Patras alone for less than

$100 of consideration, which allowed them to avoid paying a Realty Transfer Fee.  (P.'s Ex. 114)

32.  On June 8, 2001, Ruth Patras obtained a mortgage from IndyMac Bank, F.S.B. ("IndyMac").  (P.'s Ex. 113; Stip. Facts ¶ 43)  She used the same mortgage broker, Barry Szymanski, as the one who facilitated the transfer from Karach to Gallo in 1996.  (P.'s Exs. 135 Tab C & 137 Tab D)  On her mortgage application, Ruth Patras represented that the house had a fair market value of $1,600,000.  (P.'s Ex. 137 Tab E)

33.  When Ruth Patras applied for a refinancing mortgage with IndyMac, she made several misrepresentations and submitted forged documents to persuade IndyMac to approve her application when it otherwise might not have.  (Trial Tr. 139:4-17, 194:10-17, 206:17-208:13, Sept. 5, 2012; Trial Tr. 125:25- 126:18, 135:12-141:3, Sept. 21, 2012)  She lied about her position with Cadogan, saying that she was Senior Vice President instead of an Office Worker, and the length of time that she had owned the Property, claiming that she had owned it for ten years when in fact she had owned it for two months.  (P.'s Exs. 137 Tab E, 160; Trial Tr. 154:9-156:11, 157:24-158:11, Sept. 5, 2012)

Ruth Patras also said that she had been on the deed and the Washington Mutual mortgage with Gallo since 1996, which was also a lie.  (Trial Tr. 178:25-183:21, 190:19-192:9, 193:3-194:8, Sept. 5, 2012; Trial Tr. 135:12-141:3, Sept. 21, 2012)  To

10

support these misrepresentations, she submitted several forged documents, including a deed, HUD-1, Schedule A to a title insurance binder, and a mortgage statement. (P.'s Exs. 110, 137 Tabs B, I, K, & Q) All of these actions were intended to make it look like Ruth Patras's mortgage application was actually a refinance for an existing mortgage rather than a mortgage to enable her to acquire title to the Property.

34. IndyMac approved Ruth Patras for a mortgage of $900,000. (Stip. Facts ¶ 43) The mortgage was used to pay Gallo a purchase price of $848,386. (P.'s Ex. 137 Tab A) This price reflected the $153,000 in loans from Cadogan and New Brunswick Health, the $615,437.69 balance on Gallo's mortgage from Washington Mutual, and the $75,000 that Gallo paid personally. (*Id.*)

35. $153,000 of the funds from the IndyMac mortgage were given to Gallo to use to pay off the loans to Cadogan and New Brunswick Health. (*Id.*) In essence, this money was transferred from the Patrases to Gallo, who then returned it to Dr. Patras. Since Dr. Patras owned New Brunswick, $120,000 went directly to his company through him as its agent. (P.'s Ex. 136 Tab H) In addition, Dr. Patras was adamant that Gallo write a check to him personally to repay the Cadogan loan. (Cicerale Dep. Tr. 27:21-30:7; Gallo Dep. Tr. 52:16-53:8) The repayment of these loans

11

reduced the consideration that Ruth Patras paid from $848,386 to $695,386.

36.  Dr. Patras and Gallo made sure that Gallo would not make a profit from the sale by having him sell the Property to Ruth Patras for approximately the same amount that Gallo paid to Karach in 1996.  (Trial Tr. 80:21-82:4, Sept. 5, 2012)  To do so, Gallo's accountant, Cicerale, and attorney, Robert Spengler, calculated the capital gains tax that Gallo would incur from the sale ahead of time so that Dr. Patras could give Gallo enough money to cover the taxes. (*Id.* at 80:10-20; P.'s Ex. 136 Tabs J, L, N, O, & P)

37.  Dr. Patras was sent or copied on almost all of the correspondence from Ruth Patras's attorney, Spencer Robbins, concerning the transfer.  (P.'s Ex. 136 Tabs A, I, L, O)  By contrast, Ruth Patras was copied on only one of these documents. (*Id.* Tab A)  Thus, it is clear that Robbins represented both Patrases in the 2001 transfer of the Property.

38.  These actions demonstrate that Dr. Patras was heavily involved in the transaction between Gallo and Ruth Patras. Indeed, Cicerale was not even aware that Ruth Patras was involved in the transaction.  (Cicerale Dep. Tr. 27:4-17, 37:11-25)

39.  By his own admission, Dr. Patras would not have been able to purchase the Property in 2001.  (Trial Tr. 64:16-22,

Sept. 5, 2012)  At the time, he owed $888,899.07 in federal
income taxes (P.'s Ex. 115), and he had almost no assets apart
from the Property.  (Trial Tr. 64:20-65:1, Sept. 5, 2012)

40.  Further, Ruth Patras was aware of Dr. Patras's
liabilities.  When she purchased the Property, both of the
Patrases signed a letter stating, inter alia, that Ruth was
buying the Property because Dr. Patras did "not have a favorable
credit and would not be eligible for any potential loan [and he]
still owed taxes which he had not addressed."  (P.'s Ex. 186;
see also Trial Tr. 41:2-43:6, Sept. 21, 2012)

41.  Because both Anthony and Ruth Patras knew both that
Dr. Patras could not purchase the Property and that he had
significant tax liabilities, the Property was placed in Ruth's
name instead.  (P.'s Exs. 185 & 186; Trial Tr. 57:4-14, Sept. 5,
2012; 40:10-45:18, Sept. 21, 2012)  Indeed, had the Property
been placed in Dr. Patras's name in 2001, federal tax liens
would have attached to it.  (Trial Tr. 57:4-17, Sept. 5, 2012)

42.  At no time from 1996 to present could Ruth Patras have
bought or maintained the Property on her own.  (Stip. Facts
¶ 44; Trial Tr. 67:4-13, Sept. 5, 2012)  She was unemployed from
1996 until 2001, and between 1996 and 2000, her adjusted gross
income for that period was never more than $16,520.  (Id. at
126:25-129:15; Stip. Facts ¶¶ 17, 19, 21, 23, & 25; P.'s Exs.
158 & 159)  In 2001, Ruth began working for Cadogan, which her

13

husband controlled. (P.'s Ex. 160) She had an adjusted gross income of $89,190. (Stip. Facts ¶ 27) She listed $15,000 in wages from Cadogan, and $79,759 of "other income" from Cadogan. (P.'s Ex. 160)

In 2003, Ruth Patras started working for All Care Medical and Rehabilitation Group ("All Care") as well as for Cadogan. (P.'s Ex. 162) That year, she reported $27,000 in wage income from Cadogan and $51,000 in wage income from All Care. (P.'s Ex. 162) As with Cadogan, Dr. Patras controlled All Care's finances: he was the Vice President, earned more money than its owner, and signed federal tax returns on its behalf. (P.'s Exs. 123-25)

From 2001 to 2006, Ruth Patras's adjusted gross income ranged from $89,190 to $103,028. (Stip. Facts ¶¶ 27, 29, 31, 33, 35, 37) By contrast, Dr. Patras's adjusted gross income from 2001 to 2006 ranged from a high of $409,406 in 2001 to a low of $187,846 in 2006. (Stip. Facts ¶¶ 28, 30, 32, 34, 36, 38) Further, both Patrases testified that Dr. Patras provided most of the funds to maintain the Property after the transfer. (Trial Tr. 67:10-13, Sept. 5, 2012; Trial Tr. 17:24-18:3, Sept. 21, 2012)

43. After the transfer, the Patrases took out three additional mortgages on the Property. The first mortgage was from Grigory Rasin, a doctor who Robbins introduced to the

14

Patrases.  Ruth Patras took out a $40,000 mortgage from him in
October 2001, which Anthony Patras co-signed and guaranteed.
(P.'s Ex. 188; Trial Tr. 18:4-25:17, Sept. 21, 2012)

    44.  Ruth Patras took out another mortgage against the
Property in June 2002.  This mortgage was for $1,045,000 from
Lehman Brothers and was used to pay off the IndyMac mortgage and
medical and personal bills.  (P.'s Ex. 189; Trial Tr. 26:18-
28:5, Sept. 21, 2012)

    45.  The Patrases took out yet another mortgage in November
2002.  This time, Ruth and Anthony Patras borrowed $1,000,000
from GreenPoint Mortgage Funding ("GreenPoint Mortgage").  The
Patrases simultaneously took out a $300,000 home equity line
against the Property from GreenPoint Mortgage.  (P.'s Exs. 116
Tab A, 170 Tab E)  Both of them signed the loan documents and
identified themselves as borrowers and owners.  (P.'s Exs. 116,
170 Tab B; Trial Tr. 28:11-29:2, 29:17-23, Sept. 21, 2012)  They
used these loans to pay off the Lehman Brothers mortgage.  (P.'s
Ex. 170; Trial Tr. 28:12-20)

    46.  In connection with the GreenPoint mortgage, Ruth
Patras completed a Uniform Residential Loan Application.  In
that application, she stated that the fair market value of the
Property was $1,875,000, which allowed her to pull more equity
out of the Property.  (P.'s Ex. 170 Tab C)  She also made
several misrepresentations.  First, she lied about her income,

stating that she personally earned $30,000 per month when that amount actually represented her and Dr. Patras's combined incomes. (P.'s Ex. 170 Tab C; Trial Tr. 33:15-35:23, Sept. 21, 2012) She also stated that she had owned the Property for twelve years, when, in fact, she had owned it for only one year. (P.'s Ex. 170 Tab C; Trial Tr. 32:22-33:10, Sept. 21, 2012)

47. Currently, Ruth Patras owes approximately $1,300,000 on mortgages taken out on the Property. (Trial Tr. 39:10-12, Sept. 21, 2012)

48. A central question in this case is how much the Property was worth at the time of the transfer in 2001. Three different valuation opinions were offered at trial. The United States first called Barbara Herman, who was hired by Szymanski to appraise the Property in 2001 in connection with the transfer from Gallo. (Trial Tr. 123:18-124:12, Sept. 4, 2012; P.'s Ex. 137 Tab F) She valued the Property at $1,500,000 in 2001. (Trial Tr. 126:14-17, Sept. 4, 2012; P.'s Ex. 137 Tab F) The United States' expert, Patrick Ard, next testified that the Property was worth $1,221,000 in June 2001. (Trial Tr. 138:11-22, Sept. 4, 2012; P's Ex. 183) He also testified the Property was worth $1,350,000 as of 2009. (Trial Tr. 147:5-10, Sept. 4, 2012) Finally, Defendant's expert, Bret Winters, valued the Property at $950,000 as of 2001. (Trial Tr. 97:9-14, Sept. 21, 2012; P.'s Ex. 187)

16

Faced with these three competing opinions, the Court acting as factfinder must determine which valuation is correct.

At the outset, the Court finds that Mr. Winters's testimony is not credible. Mr. Winters relied heavily on a previously prepared appraisal and eventually arrived at the same valuation as that report. Defendant Patras originally asked Arthur Gross to perform a valuation. However, as Mr. Gross had passed away, she then asked Mr. Winters to testify that Mr. Gross's appraisal was accurate. Mr. Winters originally agreed to do so but later decided to perform his own valuation. (Trial Tr. 90:1-16, 100:16-101:8, Sept. 21, 2012)

After seeing a copy of Mr. Gross's report, Mr. Winters prepared his own report. The valuation he provided was identical to Mr. Gross's. (*Id.* at 101:6-9; P.'s Exs. 184 & 187) In addition, Mr. Winters's report contained two of the comparable properties that Mr. Gross used. (P.'s Exs. 184 & 187) A third comparable property was located on the same street, Round Hill, as those two properties. (P.'s Ex. 187; Trial Tr. 101:11-16, Sept. 21, 2012) Mr. Winters's appraisal failed to take into account the fact that an addition had been added to one of the properties between 2001 and 2010 when he performed the valuation. The addition added approximately 1,000 square feet to the home. (Trial Tr. 103:1-105:21, Sept. 21, 2012; P.'s Exs. 187 & 190)

Further, Mr. Winters adjusted the value of the comparable properties based on a decline in the median sales price. (Trial Tr. 105:22-107:18, Sept. 21, 2012)  When asked whether he was familiar with the common ratio and whether that would be the best test for determining if sales prices were increasing or decreasing, Mr. Winters stated that he was not familiar with the common ratio. (*Id.* at 107:22-109:5)  Because the median sales price can vary based on which homes are sold in a given year, it can be a less accurate test for determining whether there was a decline in sales prices.  The common ratio, by contrast, compares the sales price to a baseline assessment.  When a property is sold in a town, the sales price is compared to the assessment price, which yields a percentage.  Based on that percentage, it is possible to determine whether home values are increasing or decreasing in the area.

Finally, Mr. Winters testified that he spent less time on his appraisal of the Property than he usually would. (*Id.* at 99:6-22).  He charged Ruth Patras correspondingly less for the appraisal. (*Id.* at 99:17-100:2)

Thus the Court is left with Ms. Herman's and Mr. Ard's valuations.  As both experts are credible, the Court cannot

reach a conclusion through a credibility determination.[3]
However, there are other factors for the Court to consider.

Although Ms. Herman's appraisal is the only contemporary appraisal, she had a clear incentive to find that the home had a higher value, as she appraised the home in connection with Ruth Patras's IndyMac refinance application.  Ms. Herman admitted that when she appraised homes for mortgage brokers, she tried to arrive at as high a value as she could justify under the appraisal guidelines.  (Trial Tr. 129:23-130:8, Sept. 4, 2012) As Ms. Herman had motivation to inflate the value of the Property, the Court does not accept her valuation.

The Court acknowledges that Mr. Ard's valuation was also flawed.  When he performed his appraisal in 2009, he believed that the Property had a pool in 2001 when the pool was actually added later.  (*Id.* at 140:1-11)  However, the Court is satisfied with Mr. Ard's explanations at trial as to why his appraisal is still accurate.  After discovering that there was no pool on the Property, Mr. Ard reexamined the comparable properties, the sales price per square foot, and his valuation and determined that he had undervalued the Property in his original report.

---

[3] Ms. Herman has been an appraiser for 28 years and has been certified by the state of New Jersey since 1995.  (Trial Tr. 120:12-13, 120:20-23, Sept. 4, 2012)  Mr. Ard has been an appraiser for 24 years, is designated as a Member of the Appraisal Institute, is a member of the Appraisal Institute and National Association of Industrial Office Parks, and was certified by the state of New Jersey in either 1992 or 1993.  (*Id.* at 136:10-137:24)

(*Id.* at 140:14-141:16)   Thus, he did not deem it necessary to adjust his valuation.[4]

Accordingly, the Court finds that the Property was worth $1,221,000 as of June 1, 2001 and that Ruth Patras's consideration was $525,614 below fair market value.

## II.  Conclusions of Law

### A.

The United States argues first that Gallo was acting as Dr. Patras's nominee from 1996, when Gallo purchased the Property from Karach, until 2001, when he sold the Property to Ruth Patras.  The United States further argues that the transfer from Gallo to Ruth Patras was a fraudulent transfer under the UFTA. Defendant makes several arguments in the alternative.  First, she argues that Gallo was the true owner.  She then argues that Gallo was nominee of both Anthony Patras and herself and that the Property was a major marital asset.  Finally, she argues that the transfer from Gallo to herself was not fraudulent.  The Court begins with the 1996 transfer to Gallo then addresses the 2001 transfer from Gallo to Defendant.

---

[4] The Court notes that Mr. Ard also testified that if he had not determined that his original appraisal undervalued the Property, the Property without the pool would have been worth approximately $60,000 less.  (Trial Tr. 156:7-20, Sept. 4, 2012)

## 1. Gallo as Nominee

Where a property owner is acting as a nominee or alter ego for a taxpayer, the nominee's assets may be used to satisfy the taxpayer's outstanding tax liability. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977).

The United States contends that Gallo was Dr. Patras's nominee from 1996 to 2001. The central question in determining if a property owner is the taxpayer's nominee is "who has 'active' or 'substantial' control." *Shades Ridge Holding Co., Inc. v. United States*, 888 F.2d 725, 728 (11th Cir. 1989); *see also United States v. Kudasik*, 21 F. Supp. 2d 501, 508 (W.D. Pa. 1998).[5] Courts consider the following factors in making that determination: (1) whether the nominee paid adequate consideration for the property; (2) whether the property was placed in the nominee's name in anticipation of a suit or other liabilities while the taxpayer continued to control of the property; (3) the relationship between the taxpayer and the nominee; (4) the failure to record the conveyance; (5) whether the property remained in the taxpayer's possession; and (6) the taxpayer's continued enjoyment of the benefits of the property. *United States v. Klimek*, 952 F. Supp. 1100, 1113 (E.D. Pa.

---

[5] This standard is the same under both state and federal laws. *Shades Ridge*, 888 F.2d at 728 (citing *Valley Finance, Inc. v. United States*, 629 F.2d 162, 172 (D.C. Cir. 1980)).

1997); *Kudasik*, 21 F. Supp. 2d at 508-09; *see also Cody v. United States*, 348 F. Supp. 2d 682, 694-95 (E.D. Va. 2004).

In light of these factors, it is clear that Anthony Patras had active control over the Property and that Gallo was his nominee from 1996 to 2001.  First, Gallo did not pay sufficient consideration for the Property.  When Gallo purchased the property from John Karach, he made a down payment of $228,000.  Of that payment, Gallo provided $75,000 from personal funds and borrowed the remaining $153,000 from businesses that Anthony Patras owned or controlled.  The balance of the purchase price came from a $632,000 mortgage from Washington Mutual, for which Dr. Patras agreed to pay.  In sum, Gallo himself had next to no financial interest in the house.

The other factors also demonstrate that Gallo was Dr. Patras's nominee.  When Gallo bought the Property, Anthony Patras was in bankruptcy and had significant liabilities.  (*See* P.'s Ex. 138 Tab A)  Further, Patras, Gallo, and Cicerale all agreed that Gallo purchased the Property because Patras's financial difficulties prevented him from purchasing the house himself.  Anthony Patras approached Gallo, asked him to buy the Property from the Karaches, and helped facilitate the transfer.  Dr. Patras and Gallo also had an agreement that Gallo would transfer the Property back to Gallo within a year.  Gallo and Dr. Patras were best friends, and both of them said that they

were "like brothers."  Finally, the entire time Gallo owned the

it, Anthony and Ruth Patras lived at the Property and enjoyed

its benefits.

Although the conveyance to Gallo was recorded, this factor

is not dispositive given the substantial evidence supporting the

other factors.  Indeed, it is clear that Gallo was the owner of

the Property in name only.  Based on these factors, the Court

finds that Gallo was Anthony Patras's nominee from 1996 to 2001.[6]


### 2.  Transfer to Ruth Patras

The Court now turns to whether the transfer of Property

from Gallo to Ruth Patras was a fraudulent conveyance under the

Uniform Fraudulent Transfer Act ("UFTA"), N.J.S.A. §§ 25:2-20 to

-34.  "The purpose of the Fraudulent Transfer Act is to prevent

a debtor from placing his or her property beyond a creditor's

reach."  *Gilchinsky v. Nat'l Westminster Bank*, 732 A.2d 482, 488

---

[6] At trial the possibility was raised that Gallo was a nominee for both
Anthony and Ruth Patras.  However, the Court rejects this proposition.  There
is no indication that the Patrases ever owned the Property as tenants by
entireties, or that Dr. Patras attempted to put Ruth Patras on the Property's
deed before the sale to Karach.  Although the deed to Karach states that the
Property was conveyed by Anthony and Ruth Patras, the Court is unwilling to
take this as proof of joint ownership absent any intervening deed granting
title to Ruth Patras.

    Defendant argues that the Property belonged to both Patrases because it
was marital property "eligible for distribution between the spouses" (D.'s
Post-Trial Br. 5).  But that argument does not apply in this case.
Defendant's argument is premised on N.J.S.A. 2A:34-23.1.  That statute
outlines factors a court should consider when conducting an equitable
distribution during a divorce proceeding.  The situation here is hardly
analogous to such a proceeding, and the Court has seen no case law in New
Jersey that would counsel applying the law of equitable distribution to
determine ownership outside of the divorce context.  *Cf. United States v. 717
S. Woodward St.*, 2 F.3d 529, 535-36 (3d Cir. 1993) (refusing to find an
ownership interest based on Pennsylvania's equitable distribution statute).

(N.J. 1999) (citations omitted).  The premise behind the Act is
that "a debtor cannot deliberately cheat a creditor by removing
his property from 'the jaws of execution.'"  *Id.*  A fraudulent
conveyance claim negates the wrongful transaction, thus allowing
a creditor "to bring the property within the ambit of
collection."  *Id.*  The plaintiff bears the burden of proving
that the conveyance was fraudulent.  *Jecker v. Hidden Valley,
Inc.*, 27 A.3d 964, 969 (N.J. Super 2011).

N.J.S.A. § 25:2-25 defines a fraudulent conveyance as
follows:

> A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor, whether the creditor's claim
> arose before or after the transfer was made or the
> obligation was incurred, if the debtor made the transfer or
> incurred the obligation . . . [w]ith actual intent to
> hinder, delay, or defraud any creditor of the debtor.

There are two elements to whether a transfer constitutes a
fraudulent conveyance.  First, the plaintiff must show that "the
debtor . . . has put some asset beyond the reach of creditors
which would have been available to them at some point in time
but for the conveyance."  *Gilchinsky*, 732 A.2d at 488.  The
second element "is whether the debtor transferred property with
an intent to defraud, delay, or hinder the creditor."  *Id.* at
489.

The first element is easily met here.  By placing the
Property in Ruth Patras's name rather than in Anthony Patras's

24

name or both of their names, the Patrases put the Property
beyond the United States' reach.  Had the Property been placed
in Anthony Patras's name, or if it had remained in Gallo's name,
it would have been readily available to the United States.

The second element requires further investigation.  To
determine whether the debtor had the requisite intent, courts
look to the "badges of fraud" listed in N.J.S.A. § 25:2-26.
*Id.; see also MSKP Oak Grove, LLC v. Venuto*, Civil Action No.
10-6465, 2012 WL 2369353, at *5 (D.N.J. June 20, 2012) (not yet
reported).  "Actual intent often must be established through
inferential reasoning, deduced from the circumstances
surrounding the allegedly fraudulent act."  *Gilchinsky*, 732 A.2d
at 490.  Factors to consider include whether:

    a. The transfer or obligation was to an insider;

    b. The debtor retained possession or control of the
       property transferred after the transfer;

    c. The transfer or obligation was disclosed or concealed;

    d. Before the transfer was made or obligation was incurred,
       the debtor had been sued or threatened with suit;

    e. The transfer was of substantially all of the debtor's
       assets;

    f. The debtor absconded;

    g. The debtor removed or concealed assets;

    h. The value of consideration received by the debtor was
       reasonably equivalent to the value of the asset
       transferred or the amount of the obligation incurred;

      i. The debtor was insolvent or became insolvent shortly
         after the transfer was made or the obligation was
         incurred;

      j. The transfer occurred shortly before or shortly after a
         substantial debt was incurred; and

      k. The debtor transferred the essential assets of the
         business to a lienor who transferred the assets to an
         insider of the debtor.

N.J.S.A. § 25:2-26.

While a single badge of fraud may establish that a conveyance is fraudulent, "the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *Gilchinsky*, 732 A.2d at 490 (citing *Max Sugarman Funeral Home, Inc. v. A.D.B Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991); *see also United Ass'n v. Schmidt*, Civil No. 10-1815 (RBK/JS), 2011 WL 766057, at *7 (D.N.J. Feb. 24, 2011). "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Gilchinsky*, 732 A.2d at 489-90.

Seven badges of fraud are present in this case. First, the transfer was to an insider. The statute defines an insider to include a relative of the debtor. N.J.S.A. § 25:2-22(a)(1). As Ruth Patras is Dr. Patras's wife, this factor is met.

Second, Dr. Patras retained both possession and control of the Property after the transfer. He continued to live in the Property with his wife and family. He provided the money for the mortgage payments as well as for any necessary maintenance.

Further, Anthony and Ruth Patras took out several additional joint loans against the Property in which Dr. Patras was listed as an owner.

These loans also go to a third factor:  whether the transfer was concealed.  Although the transfer was not concealed per se, there is ample evidence that the Patrases took steps to conceal the fact that Dr. Patras had a significant financial stake in the Property.  The Patrases signed a document two days after the transfer saying that Dr. Patras had no interest in the Property.  The Patrases took out loans in both their names.  In addition, Ruth included Anthony Patras's income as her own in several loan applications.

Fourth, the transfer was of substantially all of Dr. Patras's assets.  He testified that his liabilities exceeded his assets in 2001 when the transfer took place and that the Property was the only substantial asset he had.  (9/5/12 Tr. Transcr. 64:20-65:1, Sept. 5, 2012)

Fifth, the consideration exchanged was not reasonably equivalent to the value of the asset.  Ruth Patras paid Gallo $848,386 for the Property, all of which came from a home loan from IndyMac.  Of that payment, Gallo used $153,000 to pay back the loans he had taken out in 1996 from New Brunswick and Cadogan to purchase the house from the Karaches.  Therefore, the total consideration Gallo received from Ruth was $695,386.  As

27

the Property was worth $1,221,000 at the time, the sum that
Gallo received was a little more than half of the Property's
value at the time, an amount that can hardly be characterized as
being "reasonably equivalent to the value of" the Property.

Sixth, Anthony Patras was insolvent at the time of the
transfer.  The UFTA provides several definitions of insolvency,
including when "the sum of the debtor's debts is greater than
all of the debtor's assets" or when a debtor "is generally not
paying his debts as they become due."  N.J.S.A. § 25:2-23(a)-
(b).  As noted above, Dr. Patras testified that his liabilities
exceeded his assets in 2001, thus rendering him insolvent.  In
addition, he was not paying his federal income taxes each year
as they were due.  This fact satisfies the final badge of fraud,
whether the transfer occurred after a substantial debt was
incurred.  In this case, Dr. Patras had approximately $900,000
in federal income tax liabilities and was continuing to accrue
liabilities.

In addition to these badges of fraud, there is direct
evidence that the Patrases had actual intent to commit fraud.
First, both Anthony and Ruth Patras testified that they placed
the Property in her name because of Dr. Patras's tax and
bankruptcy liabilities.  Second, Ruth made several false
statements in her IndyMac application, including how long she
had owned the Property, employment details, and information

28

about her assets and net worth.  Moreover, she submitted several forged documents with her IndyMac application, including a forged deed showing that she and Gallo had owned the Property as tenants in common since 1996 when, in fact, she had only been on the deed since April 16, 2001, a forged HUD-1, a forged Schedule A, and a forged mortgage statement.  Third, Dr. Patras was heavily involved in the transfer.  Ruth's attorney sent correspondence about the transfer to Dr. Patras instead of to Ruth, and Dr. Patras actively negotiated how Gallo would receive his payments and how Gallo would repay the loans to Cadogan and New Brunswick.

Given the presence of these badges and the other evidence of actual intent, the Court finds that the transfer from Gallo to Ruth Patras constituted actual fraud.

### B.

Having found that the transfer from Gallo as Anthony Patras's nominee to Ruth Patras was fraudulent, the Court must now determine the appropriate remedy.  The United States argues that it is entitled to a judgment that Anthony Patras is the Property's true owner and that the United States' tax liens attach.  The United States also seeks a personal judgment against Ruth Patras.

29

Under the UFTA, a creditor is entitled to a judgment voiding the fraudulent transfer "to the extent necessary to satisfy the creditor's claim." N.J.S.A. § 25:2-29(a)(1). As such, the Court will set aside the transfer from Gallo to Ruth Patras. Because Gallo was Anthony Patras's nominee, the Court finds that the Anthony Patras is the true owner of the Property.

The Court further finds that the United States' tax liens attach to the Property. Under 26 U.S.C. § 6321, tax liens attach to "all property and rights to property, whether real or personal, belonging to" any person who fails to pay his federal taxes. The lien arises when the tax assessment is made and continues until the tax liabilities are satisfied. 26 U.S.C. § 6322; *see also In re DeAngelis*, 373 F.2d 755, 757 (3d Cir. 1967). There is no doubt that had Dr. Patras's name been on the deed, the United States would have been able to attach a tax lien to and collect against the Property at any time between 1996 and the present. *See* 26 U.S.C. §§ 6321, 6323, 7403. As the tax liens first arose in 1996 and Anthony Patras has not satisfied his tax liabilities, the liens are still in force.

The United States also seeks a personal judgment against Ruth Patras. The United States argues that a personal judgment against Defendant Patras is necessary to recover the value of the Property because the Patrases have taken out mortgages on the house between $1,300,000 and $1,350,000. Since there is no

30

equity left in the Property against which the United States
could collect, the United States argues that it is entitled to a
personal judgment to make it whole.   The Court agrees.

The UFTA provides that a creditor may seek a personal
judgment against a transferee to recover the lesser of the value
of the transferred asset "at the time of the transfer, subject
to adjustment as the equities may require," or "the amount
necessary to satisfy the creditor's claim."   N.J.S.A. § 25:2-
30(b), (c).   At the time of the transfer, the Property was worth
$1,221,000, but Ruth Patras paid Gallo only $695,386 of
consideration.   By paying so little consideration, Ruth Patras
gained access to funds that she otherwise would not have had.
She was able to take out subsequent loans against the Property
for the Property's fair market value to pay off her IndyMac loan
with money to spare.   She then used the extra money for personal
expenses.   Ruth Patras clearly benefitted from this arrangement.

Because Ruth Patras's actions after the transfer have made
it impossible for the United States to be made whole through its
liens against the Property, the United States is entitled to a
judgment against Ruth Patras equaling the difference between the
value of the Property and the consideration that she paid, or
$525,614.

**III.**

For the reasons stated above, the Court concludes that the United States is entitled to judgment in its favor on both counts.  An appropriate Judgment accompanies this Opinion.


Date:  December 20, 2012


_/S/ Joseph E. Irenas_____

**Joseph E. Irenas, S.U.S.D.J.**